DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**GLORIA PATRICIA SANCHEZ** and **BODY & SOUL RETREAT, LLC**, a
Florida Limited Liability Company,
Appellants,

v.

**JOHANA CINQUE** and **VINCENT CINQUE**,
Appellees.

No. 4D16-2530

[ February 14, 2018 ]

Appeal and cross-appeal from the Circuit Court for the Seventeenth
Judicial Circuit, Broward County; Michael L. Gates, Judge; L.T. Case No.
CACE-14-6027-12.

Nancy S. Paikoff of MacFarlane Ferguson & McMullen, Clearwater;
Philip J. Crowley of MacFarlane Ferguson & McMullen, Tampa; and
Michael B. Kadish of The Kadish Law Group, P.C., Santa Monica,
California, for appellants.

Kelly B. Stewart, Walter G. Campbell Jr., and Brent M. Reitman of
Krupnick Campbell Malone Buser Slama Hancock Liberman, P.A., Fort
Lauderdale, for appellees.

TAYLOR, J.

A day spa and aesthetician appeal a final judgment entered against
them for $814,694, after a jury found they were negligent in performing a
chemical peel on the plaintiff. The plaintiff alleged that the chemical peel
resulted in severe and permanent aggravation to her pre-existing skin
condition, rosacea. Appellants, the defendants below, argue that the trial
court abused its discretion in excluding the testimony of their expert
witness. They also argue that the trial court erred in granting the plaintiffs
a directed verdict on comparative negligence and denying the defendants'
motion for remittitur. Plaintiff cross-appeals, arguing that the trial court
erred in denying her motion for attorney's fees after finding a proposal for
settlement ambiguous. We affirm the final judgment, but reverse the
denial of attorney's fees.

Plaintiff Johana Cinque and her husband, Vincent Cinque, sued an aesthetician, Gloria Sanchez, and a day spa, Body & Soul Retreat, LLC, for injuries the plaintiff sustained as a result of a chemical peel. The plaintiff alleged that the peel permanently aggravated her rosacea, a pre-existing skin condition. The defendants alleged the plaintiff was comparatively negligent by failing to follow medical advice.

Testimony during trial revealed that on March 19, 2013, the plaintiff went to Body & Soul for a facial. Before the procedure, the plaintiff completed a form stating that she had rosacea. Rosacea is a chronic inflammatory skin condition of the face. The plaintiff's condition was mild, causing only a rosy flushing of her checks.

Sanchez performed a chemical peel on the plaintiff. Sanchez admitted she did not read the form before she performed the procedure. Had she known the plaintiff had rosacea, she would have used a different product or done a test sample.

During the procedure, the plaintiff felt like her face was burning. Immediately after the procedure, her face continued to burn and turned bright red. Her face became blistered, bruised, scabbed, and crusted, and it oozed.

At the time of the April 2016 trial, the plaintiff's face was bumpy and turned red easily from various triggers, such as the sun and increase in temperatures. The plaintiff is a firefighter paramedic, and wearing her bunker gear also causes her face to turn red. The bumps and redness are in the exact shape of the burn to her face. She gets flare-ups anywhere from two times a week to every day. People often ask if she is okay because her face is red and ask what is wrong with her face.

The plaintiff testified that before the incident, her rosacea merely gave her cheeks a rosy appearance. She had smooth skin, received compliments all the time, and wore makeup only on special occasions. Two coworker friends confirmed that before the procedure, the plaintiff had a beautiful complexion and never wore makeup. They further testified that as a result of the procedure, the plaintiff is no longer confident and outgoing; she has become shy and antisocial.

Dr. Peter Wallach, a dermatologist, began treating the plaintiff for rosacea in October 2009. Her condition was mild, and after a visit the following month, Dr. Wallach noted her condition was improving. Dr. Wallach did not see the plaintiff again for rosacea until the day after the chemical peel, when he examined her for facial burns. Dr. Wallach

diagnosed the plaintiff with severe irritant contact dermatitis, which is a condition resulting from something that contacted and irritated the skin. A chemical peel could irritate the skin. Dr. Wallach prescribed an antibiotic cream. During follow-up visits, the plaintiff's face was red and hyperpigmented, so he gave her medication to reduce the inflammation. In May 2013, Dr. Wallach noted that the rosacea had decreased but that some hyperpigmentation remained. Dr. Wallach wrote prescriptions for medication and directed her to return in four weeks, but she did not.

Dr. Thomas Zaydon, a plastic surgeon, examined the plaintiff in May 2014. Dr. Zaydon observed a mixed pattern of rosacea and scarring. The chemical peel had taken away the skin's protective barrier, permanently damaging and injuring the plaintiff's face. He testified that a chemical peel is improper for a person with rosacea because it penetrates the protective barrier of the skin and worsens the inflammatory process. In his opinion, the plaintiff's injuries, scarring, and disfigurement were permanent and she would need a lifetime of dermatological care to control the outbursts; she could never be returned to her pre-peel clinical appearance.

Dr. Zaydon suggested that the plaintiff might benefit from laser treatment, which would cost $4,000 to $6,000 to as much as $100,000. She also might benefit from stem cell treatment. Such treatments cost $5,000 each, totaling $10,000 to $15,000. A deep tissue facioplasty could also be performed. Dr. Zaydon estimated the plaintiff's future medical bills would be around $20,000.

Dr. Quang Le, a dermatologist, treated the plaintiff on five occasions from June 2013 to April 2014. Dr. Le gave her various medications to try to reduce the redness and control her condition, but she continued to experience redness and hyperpigmentation. Dr. Le suggested that her condition could be improved with laser treatment.

Dr. Le opined that the exacerbation of the plaintiff's rosacea was caused by the chemical peel. He explained that a chemical peel on someone with rosacea causes significant damage. The peel damaged the top and mid-dermal area of the plaintiff's skin and her condition went from very mild to very difficult to control. According to Dr. Le, the redness will likely be persistent, and it will take a lifetime of treatment for the plaintiff to adequately manage and control her condition. Medical bills showed that the plaintiff paid $80 or $95 for each office visit with Dr. Le. A mortality table showed the plaintiff had a life expectancy of forty-eight more years.

On cross-examination, the plaintiff admitted she had not seen a dermatologist in two years. She had not filled a prescription for her

rosacea in two-and-a-half years and was not using any prescribed medication at the time of trial. She last paid for medication in 2013 and stopped using it in the middle of 2014, despite not having been advised by any dermatologist to discontinue the use of medication for her rosacea. She explained that she stopped taking her prescription medications because they did not work and stopped regularly seeing Dr. Wallach and Dr. Le because they only prescribed medication that did not work.

Before trial, the parties took the deposition of the defendants' expert dermatologist, Dr. Evan Schlam. In his deposition, Dr. Schlam testified that he conducted an independent medical examination on the plaintiff in January 2015, twenty-two months after the chemical peel. Dr. Schlam also reviewed her medical records, including the records of dermatologists Drs. Wallach and Le and the records of the plastic surgeon, Dr. Zaydon. Dr. Schlam's examination of the plaintiff lasted twenty minutes. The plaintiff was on medication at the time of his examination. Dr. Schlam noted mild red patches and mild dilation of the vessels. He diagnosed her with mild rosacea because "there wasn't anything pronounced" when he performed his examination. Dr. Schlam opined that the rosacea he saw was not caused by the chemical peel.

On cross-examination, Dr. Schlam admitted that he had not reviewed any photos of the plaintiff before the peel. He conceded it would have been helpful to review a photo of what she looked like before, but maintained it was not necessary. Dr. Schlam said did not observe any scarring or anything else that would be a concern as a long-term consequence of the peel. He felt it was not important to review photos taken before the procedure because the findings at the exam were so minimal that her prior appearance did not affect his opinion.

Dr. Schlam further testified on cross-examination that he assumed the plaintiff had a classic distribution of mild rosacea before the procedure based on her medical records. Dr. Schlam assumed her rosacea distribution was normal because Dr. Wallach's records did not mention otherwise. Dr. Schlam also assumed that a May 2010 visit to Dr. Wallach for a cystic nodule or spot was for rosacea, even though the records for that visit did not mention rosacea.

Before trial, the plaintiff moved in limine to exclude Dr. Schlam's testimony on the ground that his opinions failed to meet the admissibility requirements under *Daubert*. In her motion and during the hearing, the plaintiff argued that Dr. Schlam's opinion as to causation lacked reliability and an evidentiary foundation because he had no knowledge about her appearance before the peel. She contended that Dr. Schlam relied on facts

that lacked any evidentiary basis in forming his opinions; during his deposition he made assumptions and guesses and stated things that were not in the medical records. The defendants responded that the plaintiff's argument went to the weight of Dr. Schlam's testimony, not to its admissibility.

The trial court entered an order granting the motion to exclude Dr. Schlam's testimony. The court found that Dr. Schlam did not apply a reliable methodology and used speculation and assumptions to arrive at his conclusions. Specifically, Dr. Schlam claimed he was familiar with the plaintiff's condition before the procedure from reviewing her medical records, but Dr. Wallach's records did not state anything about the distribution of plaintiff's rosacea before the peel. Dr. Schlam assumed her rosacea distribution was normal because Dr. Wallach's records did not mention otherwise. Dr. Schlam also assumed that a May 2010 visit to Dr. Wallach for a cystic nodule or spot was for rosacea, even though the records for that visit did not mention rosacea.

The trial court further found that Dr. Schlam failed to consider the plaintiff's appearance before the peel, which was necessary to determine if the peel permanently aggravated her rosacea. Additionally, the trial court reasoned that "[i]t is unreliable to base an entire causation analysis on a one time examination while the patient was medicated for the subject condition." In sum, the trial court determined that Dr. Schlam's opinions were based on speculation and assumptions lacking any factual support in the medical records and excluded his testimony. At trial, the defendants did not call any witnesses.

Plaintiff moved for a directed verdict on liability and the affirmative defense of comparative negligence. Sanchez admitted that she was negligent and that she should not have done the procedure. As to the defendants' claim that the plaintiff was comparatively negligent because she failed to follow her doctors' instructions to return for future visits, the plaintiff argued there was no testimony that this had anything to do with causing her damages and that her alleged failure to follow her doctors' instructions went to the issue of mitigation of damages rather than actual liability.

The trial court granted plaintiff's motions. Thus, the jury considered only the issue of damages.

In closing arguments, the plaintiff requested $2,684.22 for past medical expenses and $82,049 for future medical expenses. As to future medical expenses, she argued (as she testified) that her foundation and soap each

cost $30 a month; laser treatments, stem cell treatments, and facioplasty would cost $20,000; and that she would need a lifetime of dermatological care every two months at $95 a visit. The plaintiff also requested $30 a day for pain and suffering, which equaled $34,110 for past pain and suffering and $526,805 for future pain and suffering. The defendants argued that damages for pain and suffering should be awarded only until the plaintiff stopped seeking treatment.

The jury returned a verdict of $2,684.22 for past medical expenses, $29,000 for future medical expenses, $23,000 for past pain and suffering, and $760,000 for future pain and suffering, for a total damage award of $814,694.22. The jury also awarded the plaintiff's husband $10,000 for past loss of consortium.

The trial court denied the defendants' motion for new trial, or alternatively, a motion for remittitur.

### Exclusion of the Defendants' Expert Witness

The defendants argue that the trial court misapplied *Daubert* and wrongfully excluded their expert witness, Dr. Schlam. Plaintiff responds that the trial court properly excluded Dr. Schlam's testimony because his opinion was not based upon reliable data and methodology. Dr. Schlam lacked sufficient knowledge of the plaintiff's pre-existing rosacea condition from which he could form an opinion regarding aggravation of her condition.

The standard of review of a trial court's ruling on a motion in limine is abuse of discretion. *Dessaure v. State*, 891 So. 2d 455, 466 (Fla. 2004). "Such discretion is limited by the rules of evidence, and a trial court abuses its discretion if its ruling is based on an 'erroneous view of the law or on a clearly erroneous assessment of the evidence.'" *Patrick v. State*, 104 So. 3d 1046, 1056 (Fla. 2012) (quoting *McDuffie v. State*, 970 So. 2d 312, 326 (Fla. 2007)).

Under *Daubert*, the trial court has "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). The trial court must consider "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. The *Daubert* test, as codified in section 90.702, requires that "[t]he testimony is based upon sufficient facts or data"; "[t]he testimony is the product of reliable principles and methods"; and "[t]he

witness has applied the principles and methods reliably to the facts of the case." "The proponent of expert testimony must, when properly challenged, establish the basis for its admissibility by a preponderance of the evidence." *Baan v. Columbia Cnty.*, 180 So. 3d 1127, 1131-32 (Fla. 1st DCA 2015).

Under section 90.791 and *Daubert*, the trial courts must "act as gatekeepers, excluding evidence unless it is reliable and relevant." *Crane Co. v. DeLisle*, 206 So. 3d 94, 101 (Fla. 4th DCA 2016). "The court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *Id.* at 101 (quoting *United States v. Frazier*, 387 F.3d 1244, 1265 (11th Cir. 2004) (en banc)).

In this case, the trial court conducted a thorough *Daubert* analysis before excluding the testimony of Dr. Schlam. The trial court found that Dr. Schlam failed to apply reliable methodology and that his opinions were based upon unfounded assumptions and thus lacked evidentiary value. Dr. Schlam rendered an opinion that the chemical peel the defendants applied to the plaintiff's face did not cause any permanent exacerbation of the plaintiff's rosacea. His opinion was based upon a brief medical examination of the plaintiff, a review of the plaintiff's medical records, and photographs of the plaintiff taken after the chemical peel. As the trial court pointed out, Dr. Schlam never reviewed any photographs of the plaintiff taken before the chemical peel to determine her pre-incident condition. Further, he relied on Dr. Wallach's medical records to form his opinion regarding the severity of the plaintiff's rosacea before the subject chemical peel. In doing so, he made unwarranted inferences and assumptions as to her pre-existing condition because Dr. Wallach's records did not provide sufficient information as to the pre-incident intensity and distribution of her rosacea and other conditions related to her rosacea. The trial court found that Dr. Schlam's conclusions were based on speculation and assumptions.

Although courts have recognized that a physical examination and review of medical records may qualify as an acceptable and reliable methodology, *see, e.g.*, *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 762 (3d Cir. 1994), an expert's opinion should not, as here, be based on assumptions not rooted in any facts actually contained in the medical records relied upon. We conclude that the trial court properly excluded the testimony of the defendants' expert, Dr. Schlam.

### Directed Verdict on Comparative Negligence

The defendants also argue the trial court erred in directing a verdict in

the plaintiff's favor on the issue of comparative negligence, because evidence that the plaintiff's own behavior in ignoring medical advice to continue treatment and take medication created a jury question as to whether the plaintiff contributed to her condition. We disagree. The trial court properly granted plaintiff's motion for directed verdict on the issue of comparative negligence because the defendants offered no evidence to support this defense. The defendants did not present any evidence that the plaintiff's failure to follow her doctors' advice contributed to the permanent aggravation of her rosacea. No medical expert testified that the plaintiff's alleged failure to seek medical treatment caused or contributed to her injury. *See Norman v. Mandarin Emergency Care Ctr., Inc.*, 490 So. 2d 76, 79 (Fla. 1st DCA 1986) (stating that mere speculation by the defendants, without supporting evidence, is insufficient to establish comparative negligence).

## Denial of Motion for Remittitur

Next, the defendants contend the trial court abused its discretion in denying their motion for remittitur. We reject this claim because the jury's award for future medical expenses and pain and suffering was not clearly excessive and was supported by the record.

"The circuit court's determination on an issue of remittitur is reviewed using an abuse of discretion standard." *Sch. Bd. of Broward Cnty. v. Pierce Goodwin Alexander & Linville*, 137 So. 3d 1059, 1072 (Fla. 4th DCA 2014); *see also Lassitter v. Int'l Union of Operating Eng'rs*, 349 So. 2d 622, 627 (Fla. 1976).

"A jury is accorded wide latitude in determining the amount of non-economic damages." *Hendry v. Zelaya*, 841 So. 2d 572, 575 (Fla. 3d DCA 2003). "The fact that a damage award is large does not in itself render it excessive nor does it indicate that the jury was motivated by improper consideration in arriving at the award." *Allred v. Chittenden Pool Supply, Inc.*, 298 So. 2d 361, 365 (Fla. 1974). A verdict should not be declared excessive "merely because it is above the amount which the court itself considers the jury should have allowed." *Bould v. Touchette*, 349 So. 2d 1181, 1184 (Fla. 1977). The verdict should be disturbed only when "it is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate." *Id.* at 1184-85.

In determining whether to grant a remittitur, a court considers the following criteria:

(a) Whether the amount awarded is indicative of prejudice, passion, or corruption on the part of the trier of fact;

(b) Whether it appears that the trier of fact ignored the evidence in reaching a verdict or misconceived the merits of the case relating to the amounts of damages recoverable;

(c) Whether the trier of fact took improper elements of damages into account or arrived at the amount of damages by speculation and conjecture;

(d) Whether the amount awarded bears a reasonable relation to the amount of damages proved and the injury suffered; and

(e) Whether the amount awarded is supported by the evidence and is such that it could be adduced in a logical manner by reasonable persons.

§ 768.74(5), Fla. Stat.

The record in this case does not show any impropriety that may have led to the size of the verdict for the plaintiff's future pain and suffering, nor is there any evidence that the jury was influenced by considerations outside of the record. The plaintiff introduced ample evidence of how the effects of the procedure caused physical impairment, disfigurement, mental anguish, inconvenience, aggravation of her rosacea, and loss of capacity for the enjoyment of life. Her skin is no longer smooth and her rosacea is no longer mild. She has permanent scarring, bumpy skin, and regular flare ups in the shape of the burn. Before the procedure the plaintiff was outgoing and social, but now she is shy and anti-social.

In short, as to the award of future pain and suffering, the defendants have not shown that the award "is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate." *Bould*, 349 So. 2d at 1184-85.

The award for future medical expenses and makeup was also supported by the record. The plaintiff introduced evidence that her foundation and soap to reduce redness each cost $30 a month. Additionally, Dr. Le testified that the cost of laser treatment, stem cell treatment, and facioplasty would be $20,000. Further, both Drs. Le and Zaydon testified that her condition would require a lifetime of treatment, and past medical bills showed office visits in the amount of $80 and $95 per visit. Although

9

the plaintiff had not sought medical treatment in the two years preceding trial, she presented expert medical evidence that her injury was permanent, requiring a lifetime of treatment.

In sum, because the defendants did not show the trial court abused its discretion in denying the motion for remittitur, we affirm on this issue.

### Cross-appeal on denial of the plaintiff's attorney's fees

After the jury verdict, the plaintiff moved for fees and costs pursuant to a proposal for settlement under section 768.79(6)(b) and rule 1.442. She attached a copy of the proposal for settlement and release in support. The proposal for settlement, which had a certificate of service dated November 24, 2015, offered to settle the case for $175,000. Paragraph 2 of the release, however, named individuals who were not parties to the litigation. Specifically, the second paragraph stated:

> The undersigned through their heirs, executors, administrators, and assigns, further agree to indemnify and hold harmless GLORIA PATRICIA SANCHEZ from and against any and all claims resulting from the alleged negligence of GLORIA PATRICIA SANCHEZ, its heirs, agents, servants or employees by any and all third parties claiming subrogation rights (whether they be statutory, contractual or common law), to recover from GLORIA PATRICIA SANCHEZ any monies paid or due to be paid by the third party or parties to or on behalf of JAMES WALLER, as Personal Representative of the [sic] PAULA FINEN, deceased, and JAMES WALLER, her husband, individually, for medical expenses or lost wages whether or not the expenses is considered to be or to have been paid by a collateral source.

The defendants argued that the proposal for settlement was ambiguous because of its reference to unknown non-parties, James Waller and Paula Finen. After a hearing, the trial court denied the motion for fees. The plaintiff cross-appealed the denial of her motion.

The plaintiff argues the trial court erred in denying her motion for fees because the proposal for settlement and release were not ambiguous. The typographical error in the release was not inconsistent with the proposal for settlement. Any possible ambiguity would be resolved by looking at the proposal and release as a whole.

An order declining to enforce a proposal for settlement is reviewed de

novo.  *Kiefer v. Sunset Beach Invs., LLC*, 207 So. 3d 1008, 1010 (Fla. 4th DCA 2017).  *See also Alamo Fin., L.P. v. Mazoff*, 112 So. 3d 626, 628 (Fla. 4th DCA 2013) ("The standard of review in determining whether a proposal for settlement is ambiguous is de novo.").

A proposal for settlement "must state with particularity any relevant conditions and all non-monetary terms." *Palm Beach Polo Holdings, Inc. v. Vill. of Wellington*, 904 So. 2d 652, 653 (Fla. 4th DCA 2005).  The proposal should "be as specific as possible, leaving no ambiguities, so that the recipient can fully evaluate its terms and conditions."  *Id.* (quoting *Swartsel v. Publix Super Markets, Inc.*, 882 So. 2d 449, 452 (Fla. 4th DCA 2004)).  A proposal for settlement must be "read as a whole" and "is not ambiguous unless a genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to the ordinary rules of construction." *Alamo*, 112 So. 3d at 630.

"[G]iven the nature of language, it may be impossible to eliminate all ambiguity.  The rule does not demand the impossible.  It merely requires that the settlement proposal be sufficiently clear and definite to allow the offeree to make an informed decision without needing clarification." *State Farm Mut. Auto. Ins. Co. v. Nichols*, 932 So. 2d 1067, 1079 (Fla. 2006). "Therefore, parties should not 'nit-pick' the validity of a proposal for settlement based on allegations of ambiguity unless the asserted ambiguity could 'reasonably affect the offeree's decision' on whether to accept the proposal for settlement."  *Alamo*, 112 So. 3d at 629 (quoting *Carey–All Transp., Inc. v. Newby*, 989 So. 2d 1201, 1206 (Fla. 2d DCA 2008)).

Although a proposal for settlement should "be as specific as possible, leaving no ambiguities, so that the recipient can fully evaluate its terms and conditions," *see Palm Beach Polo Holdings*, 904 So. 2d at 653, this general principle does not make the proposal for settlement invalid in this case because the proposal and release were not ambiguous.  There was no doubt that the plaintiff was offering to settle the case against Defendant Sanchez for $175,000 and that the release would prevent Sanchez from ever being sued again by the plaintiff for injuries relating to the March 19, 2013 procedure.  The proposal and release stated with particularity the relevant conditions and all non-monetary terms.  Read as a whole, the proposal and release did not have any ambiguities that prevented Sanchez from fully evaluating the terms and conditions.  Although the release contained a reference to non-parties, this was clearly a "cut and paste" typographical error that did not create an ambiguity that could have reasonably affected Sanchez's decision whether to accept the proposal.

The cases the defendants rely on are distinguishable because those cases involved a patent ambiguity in the amount of the settlement. *See Stasio v. McManaway*, 936 So. 2d 676, 678 (Fla. 5th DCA 2006) (finding patent ambiguity where the proposal offered to settle for $60,000, but release that accompanied proposal spelled out $59,000 while also referencing $60,000 in numerals); *Gov't Emps. Ins. Co. v. Ryan*, 165 So. 3d 674 (Fla. 4th DCA 2015) (finding proposal that spelled out $100,000 in words but also referred to $50,000 in numerals contained patent ambiguity). The defendant's reliance on *South Florida Pool & Spa Corp. v. Sharpe Investment Land Trust Number J*, 207 So. 3d 301, 304 (Fla. 3d DCA 2016), is also misplaced because in that case an ambiguity between the proposal and the release made it unclear what claims the offer was meant to include. Here, in contrast, the proposal and release made clear which claims the plaintiff was offering to settle and the amount to settle them.

More on point is *Kiefer v. Sunset Beach Investments, LLC*, 207 So. 3d 1008 (Fla. 4th DCA 2017). In that case, one of the defendants served a proposal for settlement on the plaintiff offering to settle the case solely against that defendant. The proposal incorporated a release in which two paragraphs limited the release to that defendant, while two other paragraphs did not mention that defendant's name. In reading the settlement and release as a whole, however, we found no ambiguity. We explained that all of the paragraphs related solely to that defendant and the plaintiff, and the two paragraphs that did not include that defendant's name were in between other paragraphs that did include his name. *See also Michele K. Feinzig, P.A. v. Deehl & Carlson, P.A.*, 176 So. 3d 305, 309 (Fla. 3d DCA 2015) (finding that naming attorneys in releases did not create an ambiguity between proposals and releases). Here, as in *Kiefer*, when one reads the proposal and release as a whole, it is clear that the proposal and release relate only to Sanchez and the plaintiff.

Further, courts have recognized that typographical errors do not automatically create an ambiguity. In *Mathis v. Cook*, 140 So. 3d 654, 656-57 (Fla. 5th DCA 2014), the court recognized that there were typographical errors in the release; however, the errors did not create an ambiguity. Rather, it was apparent from the release that in order to settle the matter with one defendant, the plaintiffs would be required to release all three defendants. Similarly, in *Floyd v. Smith*, 160 So. 3d 567, 569-70 (Fla. 1st DCA 2015), the court found that a typographical gender error in the proposal did not result in any ambiguity which could have affected appellant's consideration of the proposal. *See also Jefferson v. City of Lake City*, 965 So. 2d 174, 175 (Fla. 1st DCA 2007) (typographical error in proposal for settlement citing to nonexistent statute did not render proposal invalid where notice of proposal cited to correct statute number).

In sum, we conclude that the trial court erred in declining to enforce the proposal for settlement because, taken as a whole, no ambiguity existed that would have affected Defendant Sanchez's ability to make a decision.

*Affirmed on direct appeal, and Reversed on cross-appeal.*

WARNER, J., and BUCHANAN, LAURIE, E., Associate Judge, concur.

\* \* \*

***Not final until disposition of timely filed motion for rehearing.***